Filed 10/31/24  P. v. Morales CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081633 |
| v. | (Super.Ct.No. 22AD29000152) |
| VICTOR FRANK MORALES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Alexander R. Martinez, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Matthew A. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kerry Zalud Ramos and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Victor Frank Morales filed a petition to terminate his sex offender registration requirement pursuant to Penal Code section 290.5,[1] which the court denied. On appeal, defendant contends the court abused its discretion in denying his petition and setting the period to refile at four years. We affirm in part, reverse in part, and remand the matter.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 21, 1987, the People charged defendant by information with two counts of lewd and lascivious behavior (§ 288, subd. (a), counts 1 & 2) and one count of engaging in oral copulation with victim 1, a minor under the age of 14 (former § 288a, subd. (c), count 3). The People also charged defendant with three counts of lewd and lascivious behavior (§ 288, subd. (a), counts 4, 5, & 7) and two counts of oral copulation against victim 2, a minor under the age of 14 (former § 288a, subd. (c), counts 6 & 8).[2] As to counts 2 through 8, the People alleged defendant was a stranger to the victims or befriended the victims for the purpose of committing the offenses (§ 1203.066, subd. (a)(3)) and committed the offenses on more than one victim at the same time and in the same course of conduct (§ 1203.066, subd. (a)(7)). As to counts 2 through 5, the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The People alleged that count 1 occurred between February 1, 1986, and June 15, 1986; that count 2 occurred between June 15, 1986, and September 15, 1986; that counts 3 and 4 occurred between June 15, 1987, and July 1, 1987; that counts 5 and 6 occurred between February 1, 1986, and January 1, 1987; and that counts 7 and 8 occurred between January 1, 1987, and July 1, 1987.

2

People alleged defendant engaged in substantial sexual conduct with the victims who were both under the age of 11. (§ 1203.066, subd. (a)(8).)[3]

On April 28, 1988, defendant pled guilty to counts 1 and 4. On June 28, 1988, the court sentenced defendant to 10 years of imprisonment. Defendant was released from prison on July 22, 1993. Defendant subsequently violated his parole twice, for which he served two separate additional terms in prison, and was eventually released on May 16, 1996.[4]

On July 13, 2016, an officer was dispatched to a woman's apartment. The woman informed the officer that for the previous eight months, defendant had paid her six-year-old son to take out his trash.[5] Two to three weeks earlier, defendant offered to take the boy to the movies; defendant also invited the woman. The woman responded that she was not able to go at that time. She asked defendant if he would be willing to take both her six-year-old and four-year-old sons; defendant agreed.

After the movie, defendant brought the children back to the woman's apartment. Her six-year-old asked to watch a movie upstairs in defendant's apartment; the woman

---

[3] The People below contended that only one of the victims was under the age of 11; however, the information reflects allegations that *both* victims were under the age of 11. The parties on appeal, similarly and mistakenly, indicated that the victims were aged 11 and 14.

[4] Defendant's first violation garnered him 11 months 21 days in prison; for his second offense, the court sentenced him to four months 20 days.

[5] The police reports contradictorily refer to the son *once* as being five years old and *multiple times* as being six years old. However, the police reports contain the boy's birthdate, which reflects that he was six years old on the date the officers wrote the reports.

allowed him to do so. Later that evening, the woman asked her four-year-old to go to defendant's apartment to have the six-year-old return home. Upon return, the boy asked if he could spend the night at defendant's apartment. The woman thought the request odd and denied it.

Sometime later, a neighbor informed her that defendant was a registered sex offender. The woman asked her son if defendant sexually abused him; he denied any sexual abuse. The apartment manager found out and informed defendant that he could no longer have any children around him or in his apartment; defendant agreed.

The officer interviewed the six-year-old, who denied any physical contact between him and defendant. He told the officer that defendant asked him to spend the night if his mother was asleep. The next day, he watched another movie at defendant's apartment. His mother then found out that defendant was a sex offender registrant.

A corporal then responded to the apartment and requested defendant voluntarily speak with the officers at the police station. Defendant agreed.

The officer asked about defendant's relationship with the six-year-old boy. Defendant responded that he saw himself as a mentor and wanted the boy to grow up to be responsible. Defendant said that "after 30-something years of not doing anything wrong, he got too relaxed." Defendant felt sorry for the boy because his parents were unstable.

Defendant admitted taking both boys to the movie. The younger boy fell asleep in the car on the way home; defendant carried him to his mother's apartment. Defendant

4

returned to his apartment, where the boy shortly came thereafter and asked to watch television. Defendant said it was the boy's idea to spend the night at his house if his mother was asleep.

When asked if there was any physical contact between himself and the boy, defendant "was very hesitant and used many choice words such as 'I don't remember' and 'I might have.'" Defendant admitted hugging the boy several times and putting his hand on the boy's "knee and inner thigh." Defendant said, "'If I touched him inappropriately, I'm really screwed and I'm really sorry.'" The officer noted, "When I asked [defendant] if he had been completely truthful and completely honest with me, [defendant] hesitated, thought about it for about [two] seconds, and then said, 'I probably did.' [Defendant] was referring to the conversation we were talking about . . . touching [the boy] inappropriately." The officer arrested defendant for annoying or molesting a child under the age of 18. (§ 647.6, subd. (a)(1).)[6]

The public safety specialist (PSS) in charge of monitoring and registering sex offenders informed the corporal defendant might be in violation of his registration requirement because he failed to register for a vacation he took in Oregon and Washington in June 2016. On May 13, 2016, defendant told her that he was going on a camping trip for four months to Oregon and Washington. The PSS advised him that he needed to register in those jurisdictions after five days or he would be out of compliance.

---

[6] Defendant spent two days in jail, but the People apparently never filed charges against him.

She checked with Oregon's and Washington's registry websites, but defendant never registered.

Defendant returned home to register on June 7, 2016. The PSS asked him why he had not registered out of state. Defendant said, "he thought he didn't have to register because he was on federal land." The PSS told him he knew that was incorrect. The corporal recommended the People charge defendant with violating his registration requirement while he was outside the state.

On May 20, 2022, defendant filed a form petition to terminate his sex offender registration pursuant to section 290.5. On July 13, 2024, personnel from the San Bernardino Police Department, defendant's registering law enforcement agency, submitted a petition checklist reflecting that defendant did not have any pending charges that could extend the time to complete his registration requirements; was not on parole, probation, or supervised release; was not in custody; was a tier-2 offender with a minimum registration period of 20 years; had no convictions for failure to register; was currently registered; and was eligible to have his registration requirement terminated.

On September 20, 2022, the People filed a form response to defendant's petition objecting to the request on the basis that community safety would be significantly enhanced by defendant's continued registration. On March 22, 2023, the People filed formal opposition to defendant's petition. The People contended that the nature of defendant's underlying offenses, the age and number of his victims, defendant's status as a stranger to the victims, his behavior leading to his arrest in 2016, the relatively small

6

amount of time since defendant had reoffended in 2016, and the lack of evidence that he had completed a sex offender treatment program all supported denying his petition.

On May 24, 2023, defense counsel filed points and authorities in support of the petition to terminate registration. Defense counsel introduced the matter by recounting that defendant was "a 77-year-old man in failing health," who, "[a]s [a] consequence of his plea . . . has had to register as a sex offender every year." Counsel conceded that the underlying facts of defendant's offenses "were horrible." However, counsel maintained those facts alone could not demonstrate that he was a current risk to the community.

Defense counsel observed that since defendant committed the offenses over the course of 18 months, the victims were not strangers to defendant. Defense counsel also pointed out that section 1203.006, subdivision (a)(3), not only applies to instances where the defendant is a stranger, but also to situations where the defendant befriends the victims for the purpose of molesting them. Defense counsel further asserted that section 290.5 did not permit the court to consider uncharged offenses like that for which defendant was arrested in 2016. Defense counsel noted that on May 12, 2023, someone in the public defender's office conducted a "Static-99R" analysis of defendant, on which he received a score of -2, which placed him at a very low risk of reoffending.

At the hearing on June 23, 2023, defense counsel noted that "the People and I have a different view of how to apply the [Static-]99R." "There is a disagreement within the community as to how to apply the static 99R, at the time of the offense or at the time of

7

the current date essentially. The static 99R that we provided for you was done . . . as of today's date."

The People observed that defendant was not a stranger to the victims: "I misread . . . Section . . . 1203.066(a)(3) which includes a stranger or a person who befriends a child for the purpose of committing an act. I read it wrong. And when I put it in there, I wrote it wrong because it was my mistake." Nonetheless, the People argued it should still apply.[7]

The court stated, "I have read the defense petition. I have read the supporting documents and letters of recommendation basically attached to that petition. I have read the People's opposition to the petition. I have read the attached documents as well. I've also read the entirety of the Whittier Police Department [report] that was attached as well. I have considered the factors under [section] 290.5."

The court asked defense counsel whether defendant had completed a sex offender treatment program. Defense counsel responded, "At the time this occurred, it's unclear if they were even offering those types of programs." Defense counsel argued, "it was improper to essentially penalize somebody for not being in a program when there was no proof that those programs even exi[s]ted." The court replied, "Back then. But . . . what happens if 30 years have gone by when such programs exist now for several years?" Defense counsel responded, "it's whether or not, 1, the People have shown that the sex

---

[7] The court stated that they would discuss later in the hearing how it remained applicable, but none of the parties or the court ever raised the issue again.

offender program was offered to him at the time that he committed the offense and, Number 2, if it was offered to him, did he refuse it or did he take it."

The court asked who had conducted the Static-99 analysis. Defense counsel responded that an attorney from the public defender's office had performed the analysis. The court asked what agency should be generating the Static 99: "I just wanted to address this with you and ask you. I'm feeling a little bit hesitant about putting as much weight in a Static 99 analysis that is done simply by another member of either the Public Defender or D.A.'s office versus let's say you guys took it to probation or a doctor or somebody on the outside, a third party."

The People responded, "I am comfortable with [the] analysis of the Static 99. However . . . [we] disagree on the score because there is a difference of opinion in the sexual offender evaluation community as to when the score should be scored. My position is it should have been scored at the time he was released from custody on his index offense which was the [section] 288." The People contended that at the time defendant committed the offenses, "he was 48 years old. So his score—because it was done at this age when he is I believe in his seventies, he got" "a lower score." "He got a negative 3. If it was done at the time of the index offense, it would have been a negative 1." The People continued, "I'd be willing to allow the Court to consider [the public defender's] declaration and her static assessment as long as we could agree that it's in a range between a zero and a negative 2."

9

The People submitted noting they were "relying largely on the Whittier arrest back in 2016. The People are also relying on the severity of the index offense as well as the number of victims." Defense counsel observed, "It's just that he's a 77-year-old man who hasn't committed a crime in 30 years. And I don't think this is a person that needs to be registering."

The court went through all seven factors it was required by statute to consider. With respect to the first factor, the court noted the case originally involved eight offenses against two victims, which defense counsel conceded "'were horrible.'" The court noted the victims were both children, "and their ages were 14 and 11 at that time respectively."[8] The court observed that, "defendant appears to have known and interacted with the victims in this case for approximately a year and a half. So based on the Court[']s reading of . . . [section] 290.5 and how the word 'stranger' is defined specifically in that section, in this Court's view it does not appear that either of the victims in the original case were strangers to the defendant."

The court noted that defendant had twice violated his parole, for which the courts had returned him to prison; however, since defendant's "second parole violation in 1995, the defendant has not received any further felony or misdemeanor convictions of any kind, and he appears to have properly registered every year pursuant to Penal Code 290 ever since then as well."

_____

[8] As to both factors 1 and 2, the court incorrectly reflected the ages of the victims as noted in footnote 3 *ante*. Both victims were under the age of 11.

10

The court observed there was no evidence defendant had completed a sex offender management treatment program. "Although we don't have any evidence before us indicating there was a program offered or not or one was available, fair enough. The Court will acknowledge that. The statute as it's written and all the requirements if a defendant should go through in order to obtain 290.5 relief, . . . there is nothing that states that requirement that it had to have been offered back at the original time. The Court will note that 36 years has transpired. Any point during which those 36 years when those programs became available, the defendant could have availed himself of taking such a course. He chose not to do so. So at this point in time, that factor, the defendant has not successfully completed such a program."

The court observed that a member of the public defender's office had performed the Static-99 analysis on defendant and that the parties acknowledge a difference of opinion on the result of that analysis.

The court then stated, "Now the Court will address the single largest issue in this case, and that is the incident reported by the Whittier Police Department in the year 2016." After extensively recounting the facts of the incident, the court noted that, "Quite frankly, the Court finds this incident from 2016 to be disturbing. The defendant, a single older man who was a registered sex offender for molesting two children, instead of choosing to spend his time with family members or people of his own age, instead was actively choosing to spend his time alone with a six-year-old boy and his even younger brother taking them to the movies alone and then having that six-year-old come alone to

11

his apartment . . . to watch a movie or movies.  And then that same man apparently admits to the police he had been touching that child, hugging him repeatedly, and touching the boy's knee and inner thigh."

The court, in "reviewing all seven of the factors in their totality, most importantly, the troubling events of the defendant's apparent arrest in 2016 for . . . [a section] 647.6 [offense] and to a lesser extent the fact that the defendant has never completed a sex offender management board-certified sex offender treatment program, the Court comes to the conclusion, based on the current law, that the People have indeed met their burden of proof to this Court of showing that community safety would be significantly enhanced by requiring the defendant to continue to register, . . ."  Thus, the court denied the petition.

On the issue of the number of years defendant needed to wait before refiling, defense counsel submitted on the record requesting that he be permitted to refile in one year.  The People requested a minimum of three years, "If he was convicted of this 2017 [*sic*] incident and only that, he would be required to register for 10 years.  So it's the People's position he should register at least 10 years subsequent to the 2016 incident.  So the People would submit on requesting a minimum of three years."

The court ordered, "Based upon the facts as the Court has seen them pursuant to . . . [section] 290.5(a)(4), the Court finds that the defendant may re-petition this Court for termination of his registration status no sooner than four years from today's date . . . the soonest that he can bring this petition again would be June 23 of the year 2027."

## II. DISCUSSION

### A. Law

"[O]ur Legislature amended the sex offender registration statutes in 2017 to create a three-tiered system, with offenders in each tier presumptively obligated to register for different periods of time depending on the degree of risk they pose to the community (Stats. 2017, ch. 541, § 2.5; see § 290, subd. (d))." (*People v. Franco* (2024) 99 Cal.App.5th 184, 191 (*Franco*).) "Tier 2 is for sex offenders posing a medium risk of recidivism. They may generally apply for removal from the sex offender registry after 20 years [citation] . . . ." (*Ibid.*)

"Once a . . . Tier 2 defendant has been a sex offender registrant for the minimum amount of time mandated by their tier, they may petition to be removed from the registry and for relief from the duty to continue to register. [Citation.] If the defendant does not 'meet the statutory requirements' for removal or has not properly served or filed their petition, the trial court may summarily deny the petition after 'stat[ing] the reasons' for doing so. [Citation.] If the defendant avoids summary denial, the People must elect whether to request a hearing. If the People do not request a hearing, the trial court must grant the petition as long as the defendant is currently registered, has no pending charges, and is not in custody or on parole, probation or supervised release. [Citation.] If the People request a hearing, the court must convene one. [Citation.]" (*Franco*, *supra*, 99 Cal.App.5th at pp. 191-192.)

"The purpose of the hearing is for the People to 'present evidence' as to whether 'community safety would be significantly enhanced by requiring continued registration.' [Citation.] In making this determination, the trial court 'shall consider' seven factors: (1) 'the nature and facts of the [underlying,] registerable offense'; (2) 'the age and number of victims'; (3) 'whether any victim was a stranger [to the defendant] at the time of the offense'; (4) 'criminal and relevant noncriminal behavior before and after conviction for the [underlying,] registerable offense'; (5) 'the time period during which the [defendant] has not reoffended'; (6) 'successful completion, if any, of a Sex Offender Management Board-certified sex offender treatment program'; and (7) 'the [defendant's] current risk of sexual or violent reoffense, including the person's risk levels on [the static risk assessment instrument for sex offenders (SARATSO)] static, dynamic, and violence risk assessment instruments, if available.' [Citation.] Permissible evidence includes 'declarations, affidavits, police reports, or any other evidence submitted by the parties which is reliable, material, and relevant.' [Citation.]" (*Franco*, *supra*, 99 Cal.App.5th at p. 192.)

"The trial court's task is to assess whether the People have carried their burden of 'produc[ing] evidence establishing that requiring continued registration appreciably increase[s] society's safety.' [Citation.] If the court denies the petition, it must also 'set the time period'—between one and five years—'after which the [defendant] can repetition' for relief, and must 'state on the record the reason' for the time period it selects. [Citation.]" (*Franco*, *supra*, 99 Cal.App.5th at p. 192.)

14

"We evaluate a trial court's decision whether to grant or deny a petition for removal from the sex offender registry for an abuse of discretion, reviewing any subsidiary factual findings based on disputed facts for substantial evidence . . . ." (*Franco*, *supra*, 99 Cal.App.5th at p. 192; accord, *People v. Thai* (2023) 90 Cal.App.5th 427, 433 (*Thai*).) "To establish an abuse of discretion, a defendant must demonstrate the trial court's decision fell outside the bounds of reason, i.e., was arbitrary, capricious, or patently absurd. [Citation.]" (*Thai*, at p. 433.)

B. The Denial of Defendant's Petition

Defendant contends the court abused its discretion in denying his petition. We disagree.

Here, substantial evidence supported the court's denial of defendant's petition. First, the court demonstrated that it was thoroughly conversant with the parties' moving papers and the exhibits supporting them. It thrice indicated that it had read all the filings and the exhibits in support of them. The court addressed each of the issues raised in those filings and the evidence to support those issues on both sides.

Second, the court demonstrated that it was thoroughly conversant with the applicable law. The court expressly stated it had considered the applicable factors under section 290.5. The court then explicitly applied the facts of the case to all seven factors under section 290.5. Thus, this is not a case where the court misunderstood the law or was unaware of the facts when issuing its ruling.

Third, substantial evidence supported the court's determinations as to each factor under section 290.5 and its overall ruling in denying the petition. As to the first two factors, the court noted the case originally involved eight counts of sexual acts against two children aged 14 and 11 occurring over the course of 18 months.[9] The case prints, information, abstracts of judgment, and minute order support the age of the children, the number of victims, the number of originally charged offenses, the types of offenses, the time span over which the offenses occurred, and the charges to which defendant pled. The court noted that defense counsel below conceded the offenses "'were horrible.'" Thus, substantial evidence supported the court's implicit determination that factors one and two weighed against defendant.[10]

Defendant contends that any determination that these factors weighed against him was undermined by the 35 years that had elapsed since the commission of the offenses. Were this an incident wherein defendant had committed a single offense against a single victim, we might agree. (*Thai*, *supra*, 90 Cal.App.5th at pp. 430, 434 [single act against a

---

[9] The court misspoke in indicating that four of the counts were for lewd and lascivious behavior and four involved oral copulation. In fact, five counts involved lewd and lascivious behavior and three were for oral copulation. Also, as noted in footnote 3 *ante*, the victims were both under the age of 11.

[10] Defendant maintains that the court did not hold the first two factors against him. We disagree. Although the court did not explicitly rule that the two factors weighed against defendant, the court's recitation of the offenses, charges, duration of the conduct, and age of the victims, combined with its notation of defendant's concession that the offenses "were horrible," strongly implies the court held these factors against defendant.

16

single victim]; *Franco*, *supra*, 99 Cal.App.5th at p. 188 [single act against a single victim].)

Here, however, the charges and allegations against defendant establish the long-term, continual molestation involving oral copulation and masturbation against two separate victims, both of whom were under the age of 11. Although the facts of the underlying offenses should not be dispositive with respect to the court's ruling on defendant's petition, substantial evidence here supported a determination against defendant on the first two factors, particularly where defense counsel below conceded they "were horrible," to which the court apparently agreed.

With respect to the third factor, the court noted defendant "appears to have known and interacted with the victims in this case for approximately a year and a half." Thus, "in this Court's view it does not appear that either of the victims in the original case were strangers to the defendant." Therefore, the court implicitly found this factor weighed in favor of defendant.

We disagree with the court's determination on the third factor. As the parties both below and on appeal agree, the People charged defendant with enhancement allegations on counts 2 through 8, that defendant was a stranger to the victims or befriended the victims for the purpose of committing the offenses. (§ 1203.066, subd. (a)(3).) Even if the People alleged the enhancement on the latter basis, it is still possible that defendant was a stranger to the victims, who befriended the victims on the day he committed the

17

first offense against each of them. Thus, in such a situation, he would still qualify as a stranger to the victim.[11]

However, there is simply not sufficient evidence in the record here to determine whether the allegation was alleged on the former or latter basis under section 1203.66, subdivision (a)(6), or whether defendant befriended the victims and engaged in illicit conduct with them within 24 hours of such befriendment. Thus, the evidence on whether defendant was a stranger to the victims is neutral at best, and should not have weighed for or against defendant on this factor.

With respect to the sixth factor,[12] the court found that defendant had not completed a sex offender treatment program. The court implicitly ruled this factor weighed against defendant because regardless of whether such a program had been offered to defendant or whether such programs existed when defendant was convicted, they had existed for several years at the time of the hearing and defendant had failed to avail himself of them. (*Thai*, *supra*, 90 Cal.App.5th at p. 434 [The defendant expressed a willingness to his probation officer to participate in such a program and his counsel represented that he had completed such sex offender counseling.].) We agree with the court.

---

[11] A victim is a stranger if they knew the offender for less than 24 hours at the time of the offense. (§ 290.5, subd. (a)(3).) "[H]aving a stranger victim is related to sexual recidivism." (*Thai*, *supra*, 90 Cal.App.5th at pp. 433-434, fn. omitted.)

[12] The court decided to evaluate the factors out of strict numerical order.

18

Defense counsel in *Thai* asserted the same position as defendant here; however, in *Thai*, counsel admitted that sex offender management board certified treatment programs first existed in 2006. (*Thai*, *supra*, 90 Cal.App.5th at p. 431.) Appellate counsel contends that the program was not implemented until 2014. Even still, this would have given defendant eight years to have started and completed such a program prior to filing his petition. Defendant's failure to do so weighs against him on this factor.

On the seventh factor, defendant's Static-99 analysis, the court noted that a member of the public defender's office had conducted the analysis. The court asked whether a neutral party should have conducted the analysis. Although the People were comfortable with the administration of the Static 99 by the public defender's officer, they disagreed with the scoring; they asserted it should have been conducted when defendant was convicted rather than 30 years later, which affected the score in defendant's favor.

The court noted that it would take account of the Static-99 analysis, but it would acknowledge "there is a difference of opinion about whether or not—what has the more probative value, the Static 99 done at the release from custody of the underlying offense versus one done now and that, based upon the time frame that goes in between those two events, there would be a difference of the scoring, whether negative 1 or negative 2."[13]

---

[13] We also note, as discussed in footnote 12 *ante*, that whether defendant was a stranger to the victims at the time he committed the offenses would also change defendant's Static 99 score. (*Thai*, *supra*, 90 Cal.App.5th at pp. 433-434.) It is apparent that the public defender's analysis of the Static 99 did not reflect that he was or could have been a stranger to the victims.

The court does not appear to have made any determination as to how the Static 99 weighed in its analysis.

On the fourth and fifth factors, criminal and relevant noncriminal behavior before and after the defendant's conviction for the underlying offense and the time during which the defendant had not reoffended, the court noted that defendant had twice violated his parole on the underlying offenses.

The court recounted the facts of the 2016 incident at length. The court noted, "this Whittier police incident from 2016 in this Court's view is the single most important definitive factor in this Court's decision today. Quite frankly, the Court finds this incident from 2016 to be disturbing. The defendant, a single older man who was a registered sex offender for molesting two children, instead of choosing to spend his time with family members or people of his own age, instead was actively choosing to spend his time alone with a six-year-old boy and his even younger brother taking them to the movies alone and then having that six-year-old come alone to his apartment alone to watch a movie or movies. And then that same man apparently admits to the police he had been touching that child, hugging him repeatedly, and touching the boy's knee and inner thigh." The police reports and case prints provided substantial evidence for the court's finding that the 2016 incident weighed against defendant on this factor.[14]

---

[14] Not noted by the court or the parties, either below or on appeal, is that defendant's criminal record also included a prior conviction for assault with a deadly weapon and prior charges for battery, vandalism, and indecent exposure, which were dismissed in "furtherance of justice." Likewise, although the People never charged defendant with being in violation of his registration, defendant had gone on vacation in

*[footnote continued on next page]*

20

The court, when "reviewing all seven of the factors in their totality, most importantly, the troubling events of the defendant's apparent arrest in 2016 for . . . [section] 647.6 and to a lesser extent the fact that the defendant has never completed a sex offender management board-certified sex offender treatment program, the Court [came] to the conclusion, based on the current law, that the People have indeed met their burden of proof to this Court of showing that community safety would be significantly enhanced by requiring the defendant to continue to register."  Substantial evidence supported the court's conclusion.

As discussed *ante*, substantial evidence supported the court's explicit or implicit determinations that factors 1, 2, 4, 5, and 6 weighed against defendant.  The court appears to have come to no conclusion regarding factor 7, so we will assume it weighed neutrally in its overall analysis.  The court found that factor 3 weighed in favor of defendant, with which we noted we disagree.  Thus, the court weighed at least five of the seven factors against defendant, weighed one in favor, and one neutrally.  The court properly weighed each factor in determining that the confluence of factors supported a conclusion that continued registration would appreciably increase society's safety.[15]  Thus, the court's denial of defendant's petition was well within its discretion.

Oregon and Washington and failed to register despite the PSS expressly telling him he was required to do so.

[15]  We therefore reject defendant's contention that the court improperly "re[lied] heavily," "entirely," or "primarily" on the 2016 incident.  As discussed *ante*, the court examined each factor required by section 290.5, it merely determined that factors 4, 5, and 6 weighed more heavily against defendant than the other factors.  The court did not

*[footnote continued on next page]*

21

We note of special importance here with respect to the 2016 incident is that the only factor that compelled the mother to stop allowing her six-year-old boy to spend time alone with defendant in his apartment was the requirement that he register as a sex offender, of which she was notified by a neighbor. Had defendant not been required to register as a sex offender, the mother may have continued to allow the boy to spend lengthy periods of time alone with defendant, which may have provided too much temptation to defendant and would expose the boy to potentially "horrible" sexual molestation. Requiring defendant to continue to register as a sex offender appreciably increased society's safety by providing people with potential notice that they should not allow children to spend time alone with defendant.

C. Refiling Period

Defendant contends the court abused its discretion in selecting four years as the period defendant would have to wait until refiling. We agree.

As defendant notes, although required by statute, the court did not give its reasons for selecting four years as the period defendant would have to wait until refiling his petition. Nonetheless, we agree with the People that the court was adopting the People's argument as its reasoning.

The People requested the court order that defendant wait a minimum of three more years before refiling, which would have been 2026, 10 years from the 2016 incident, or the number of years he would have been required to register as a sex offender if he had

rely exclusively on any factor in denying defendant's petition. Moreover, the court could properly consider the factors both quantitively and qualitatively.

22

been convicted of the offense for which he was arrested. However, at one point during its argument on this issue, the People mistakenly cited the incident as occurring in 2017.

The court ordered that defendant be required to wait four years, or until 2027, to refile. Thus, it appears the court adopted the People's reasoning but also adopted the People's mistaken citation to the incident as occurring in 2017. Since this is one more year than even the People were requesting, appears to be based upon a mistake, and the court failed to articulate its basis for selecting four years, we shall reverse and remand the matter for the limited purpose of selecting the period for refiling, requiring the court to state its basis for selecting this period.

## III. DISPOSITION

The court's order denying defendant's petition is affirmed. The court's order selecting four years as the period defendant must wait until he may refile is reversed. The matter is remanded for the limited purpose of allowing the court to select the period for refiling, for which it must state on the record its reason. (*Franco*, *supra*, 99 Cal.App.5th at p. 192; § 290.5, subd. (a)(4).) We express no opinion on the period the court may select.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER _____

J.

We concur:

RAMIREZ _____

P. J.

MENETREZ _____

J.

23